# United States District Court
# Central District of California
# Western Division

ALFRED RAY ALLEN,

                Plaintiff,

    v.

CONTINENTAL CASUALTY
COMPANY, *et al.,*

             Defendants.

CV 06-03111 TJH (PLAx)

Findings of Fact

and

Conclusions of Law

The Court, having considered all of the evidence and the parties' briefs, hereby issues the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1.  This action was filed as a result of Defendant Stillwater Mining Group Disability Plan's ("Plan") discontinuation in September, 2004, of Plaintiff, Alfred Ray Allen's ("Allen") long-term disability benefits.  The Plan is an employee welfare benefit plan within the meaning of the Employee Retirement and Income Security Act of 1974, 29 U.S.C. §§ 1001-1350 ("ERISA").

2.  Allen started working for Stillwater Mining Company ("Stillwater") as a chemist, and

eventually became a technical supervisor and metallurgist.  As of 2002, his work involved determining metal concentrations in ores, and working to improve the level of recovery of the metal.  He worked eight to ten hours a day, supervising three employees.  In 2002, he was 46 years old.

3. As a technical supervisor, Allen spent most of his time at work sitting and using the computer, telephone, and calculator.  He did limited walking, lifting, and standing.

4. The Plan is insured by a Group Long-Term Disability Policy ("Policy") that was issued by Defendant Continental Casualty Company ("CNA").  Pursuant to the terms of the Plan, monthly long term disability ("LTD") benefits begin after a 180-day elimination period.  Under the Plan, the LTD benefit is 60% of an employee's monthly earnings minus any applicable offsets.

5. The Plan's documents state, in pertinent part:

We agree with the Employer to insure certain eligible employees of the Employer.

We promise to pay benefits for loss covered by the policy in accordance with its provisions.

"We" is defined as CNA, and "You" or "Your" is defined as the covered employee.

6. The Policy defines disability based upon an Occupational Qualifier or an Earnings Qualifier.  Only the Occupational Qualifier is at issue here.  The Plan, further, provides that:

"Disability" means that during the Elimination Period and the following 24 months, Injury or Sickness causes physical or mental impairment to such degree of severity that You are:

1.  continuously unable to perform the Material and Substantial Duties of Your Regular Occupation; and

2.  not working for wages in any occupation for which You are or become qualified by education, training or experience.

After the Monthly Benefit has been payable for 24 months, "Disability" means that Injury or Sickness causes physical or mental impairment to such a degree of severity

that You are:

    1.  continuously unable to engage in any occupation for which You are or become qualified by education, training or experience; and

    2.  not working for wages in any occupation for which You are or become qualified by education, training or experience.

7.  The Policy also contains the following exclusions and limitations:

The policy does not cover any loss caused by, contributed to, or resulting from:

Disability beyond 24 months after the Elimination Period if it is due to a Mental Disorder of any type.  Confinement in a Hospital or institution licensed to provide care and treatment for mental illness will not be counted as part of the 24-month limit.

Disability beyond 24 months after the Elimination Period if it is due to a diagnosed condition which manifests itself primarily with Self-Reported Symptom(s).

The term "Mental Disorder" means:

[A] disorder found in the current diagnostic standards manual of the American Psychiatric Association.

The term "Self-Reported Symptoms" is defined in the Policy as:

[T]he symptoms of which You tell Your Doctor and are not verifiable or quantifiable using tests, procedures, or clinical examinations Generally accepted in the Practice of Medicine.  Examples of these manifestations include the following, but are not limited to: fatigue, pain, headaches, stiffness, soreness, tinnitus (ringing in the ears), dizziness, numbness, or loss of energy.

8.  The Policy is governed by Montana law, and contains discretionary authority language:

The policy is delivered in and governed by the laws of the governing jurisdiction and to the extent applicable by the Employee Retirement Income Security Act of 1974 (ERISA) and any amendments.  When making a benefit determination under the

1   policy, We have discretionary authority to determine Your eligibility for benefits and

2   to interpret the terms and provisions of the policy.

3   9.   The Summary Plan Description ("SPD"), also, states that:

4   The Administrator and other Plan fiduciaries have discretionary authority to interpret

5   the terms of the Plan and to determine eligibility for and entitlement to benefits in

6   accordance with the Plan.

7   10.   The Plan's claim administrator was CNA.

8   11.   The claim administrator had discretionary authority to interpret the terms of the Plan and

9   to determine eligibility for and entitlement to benefits.

10   12.   On September 6, 2000, Allen submitted his first claim for disability benefits based upon

11   a back condition for which he was about to undergo surgery.  CNA approved the claim and paid

12   benefits for six months through March 8, 2001, when Allen returned to work.

13   13.   Two months later, on or about May 24, 2001, Allen submitted a new claim for disability

14   benefits, this time based on a diagnosis of Hepatitis C.  Allen was treated for this condition with a

15   series of chemotherapy drugs, Interferon and Ribovarin.   These drugs have significant side effects,

16   for example the physician's report on December 17, 2001, confirmed side effects of "depression,

17   cytopenias, excessive fatigue, possible autoimmune phenomenon, hypothyroidism."

18   14.   CNA initially approved and paid the maximum duration for short-term disability benefits

19   – 26 weeks –  and then evaluated the claim for continued payment under LTD coverage.  Allen's

20   claim for short term disability benefits was administered and paid under a separate policy not at

21   issue in this case.

22   15.   On November 9, 2001, CNA conducted a telephonic interview with Allen.  He informed

23   CNA that he had difficulty sleeping; short-term memory problems; extreme fatigue; and "anxiety,

24   depression, and suicidal and homicidal thoughts from time to time."

25   16.   On November 13, 2001, Allen's treating physician, Dr. Bradley Zins, completed a

26   Medical Assessment Tool questionnaire and reported that Allen would be able to return to work in

1   a month or two since his Hepatitis C treatment would end in two to three weeks.

2       17.  On November 16, 2001, CNA approved Allen's claim for LTD benefits.  Allen was

3   advised that benefits were payable for twenty-four months as long as he was "disabled" from the

4   material and substantial duties of his own occupation.  In addition, CNA informed Allen that the

5   benefit period was limited to twenty-four months because the medical information received

6   indicated his disability was the result of a mental or emotional disorder.

7       18.  On December 14, 2001, CNA received a letter from Allen in which he disputed that his

8   disability was the result of a "mental or emotional" disorder.  Rather, Allen asserted that he suffered

9   from "[H]epatitis C that causes chronic illness and physical side effects from required treatment."

10      19.  On January 8, 2002, CNA conducted another telephonic interview with Allen, who

11  reported that his last treatment of Interferon was in December, 2001.  However, Allen reported that

12  he was "not feeling good," had "severe pain in his bones," and was "fatigued" and had "trouble

13  sleeping."  Allen stated that he did not know when he would return to work.

14      20.  The following day, CNA requested Dr. Zins to complete a Functional Assessment Tool

15  questionnaire, but was informed that Allen had changed treating physicians and was now seeing Dr.

16  Stephen Baum.  After Dr. Zins prepared the Medical Assessment Tool questionnaire, Allen switched

17  physicians because "he could not get along with Dr. Zins."  Thus, CNA requested medical records

18  and information from Dr. Baum.

19      21.  On February 20, 2002, CNA received a medical report from Dr. Baum dated January 13,

20  2002, in which he advised that Allen was clear of the Hepatitis C virus and that no further treatment

21  was indicated.  Dr. Baum, also, concluded that Allen was capable of returning to work.

22      22.  On February 22, 2002, Allen called CNA regarding the status of his claim.   CNA

23  attempted to obtain additional information from Allen at this time, however, Allen would only

24  provide his current address, treating providers, and medications.  Allen refused to answer any

25  additional questions.

26      23.  On March 28, 2002, a nurse case manager conducted an in-person interview with Allen

at his home in Montana.  Allen reported that he was unable to work due to Hepatitis C and its medications, although he was last administered the medication in December, 2001, and tests showed that his body was clear of the virus.  Allen, also, reported that the part of his job he could no longer perform was "getting there and staying there for fifteen hours a day," due to "pain, fatigue, memory loss, irritability, nausea, extreme hot/cold flashes, depression, [and] insomnia."

24.  On April 4, 2002, CNA notified Allen that the information received from Dr. Baum did not demonstrate that Allen continued to be disabled and that, without further proof of disability, benefits would be terminated effective March 19, 2002.

25.  Allen, then, submitted additional information, asserting he was unable to work due to chronic pain syndrome, chronic fatigue, and depression as a result of his Hepatitis C treatment, and requested that CNA reconsider its decision.

26. Dr. Clint Hauxwell, Allen's treating rheumatologist, completed an Attending Physician's Statement and reported that the effects of the Interferon can be seen "for up to six months."   Dr. Hauxwell determined that because Allen was no longer being treated with the Hepatitis C medications, which had caused him to experience side effects, any lasting effects should resolve by June, 2002.  Dr. Hauxwell provided restrictions and limitations of no recurrent bending at the waist and no prolonged standing, neither of which would have prevented Allen from performing the substantial and material duties of his own occupation.

27.  On April 12, 2002, CNA advised Allen that the supplemental information was insufficient to alter its decision, as the information from Dr. Hauxwell did not establish that Allen continued to be disabled.

28.  On May 15, 2002, Allen, through his prior attorney, submitted a formal request for reconsideration of CNA's denial of his LTD benefits.  Dr. Hauxwell, also, tendered a letter on Allen's behalf, asserting Allen was recently diagnosed with "significant hypothyroidism," which contributed to his fatigue, and muscle and joint pain.  Dr. Hauxwell concluded that Allen was "fully disabled" and "unable to return to gainful employment," but that his condition would be "stabilized"

1   in twelve weeks.

2       29.   CNA then referred Allen's claim file to a nurse case manager for review.   The nurse

3   determined the additional medical information was insufficient to support Allen's functional

4   impairment beyond February 20, 2002, the date that CNA received Dr. Baum's letter indicating that

5   Allen was clear of the Hepatitis C virus.

6       30.   On May 17, 2002, CNA advised Allen that the medical documentation did not establish

7   that he was disabled and unable to perform the material and substantial duties of his occupation

8   beyond February 20, 2002.   Therefore, Allen's file was being sent to the Appeals Committee for

9   final review and determination.

10      31.   On June 26, 2002, upon conclusion of its review of Allen's file, the Appeals Committee

11  notified Allen that it was upholding the denial of his claim.   The Appeals Committee concurred with

12  the prior decision that the physical and clinical findings did not support Allen's inability to perform

13  his regular work activity.   Allen was informed that he had exhausted his administrative remedies and

14  that his file was closed.

15      32.   In October and November, 2002, Stillwater's Human Resources Department offered

16  CNA additional medical records regarding Allen.    CNA agreed to review and consider the

17  additional records.   Included in this documentation was a November 13, 2002, letter from Dr. Baum,

18  which stated that Allen remained free of the Hepatitis C virus and, therefore, "it is not likely at all

19  that this is the cause of [Allen's] problems with fatigue and arthritis or other symptoms."

20      33.   The records received from Stillwater demonstrated Allen's ability to function in excess

21  of his self-reported limitations.   According to a June 11, 2001, office visit note by Dr. Hauxwell,

22  Allen was involved in a motorcycle accident on or about June 1, 2001.   In addition, according to a

23  December 19, 2001, medical progress report by Dr. Albert C. Reynaud, a dermatologist, Allen had

24  "spent about a month [in September 2001] hunting up in the northeastern part of the state."   On

25  March 11, 2002, Dr. Hauxwell noted that Allen was coming in for an examination after "being out

26  of town for some time."   Allen reported that he had been taking care of his father in Kentucky and

then spent a week in the Cayman Islands vacationing.

34.  The records received from Stillwater, also, reflect that on November 24, 2001, Allen was admitted to the hospital and diagnosed with a "[m]ild closed head injury with his neurologic exam impaired by alcohol intoxication."  At the time, Allen's blood alcohol level was 0.16.  Both Dr. Mary Jozwiak, who was another treating physician, and Dr. Hauxwell subsequently concluded a substance abuse evaluation would be helpful.  Allen, also, provided inconsistent accounts to his physicians of what actually occurred that night.  One version Allen gave was that he was walking home after drinking at the Snow Creek Bar when he was struck on the side of his face with a "pipe;" another version was that he was struck by a "bottle;" and finally, during a follow-up consultation with Dr. Jozwiak, Allen stated that he was involved in a "bar brawl."  Dr. Jozwiak noted that Allen admited that the "bar fight" was "alcohol-related."

35.  The records received from Stillwater further establish that Allen's depression, and emotional and memory problems existed before and independent of the Hepatitis C treatment, and was only aggravated by the Hepatitis medication during its administration.  On November 1, 2001, Dr. Zins reported that Allen had "continued to have substantial difficulties with agitation, some depression and the like that predated the Interferon, but of course has been worse on treatment."  Dr. Zins, also, determined that Allen "had some mild memory loss preceding the Interferon and this has been worse on treatment."  Further, on May 1, 2002, Dr. Bill Rosen, a doctor who filed a consultation report with Dr. Hauxwell, opined that Allen had a history of depression likely aggravated by the Hepatitis C.

36.  On November 26, 2002, CNA reaffirmed its denial of Allen's LTD claim.

37.  On May 30, 2003, Allen filed suit against against CNA and the Plan, alleging claims for breach of ERISA.  In January, 2005, the parties reached a confidential settlement in which Allen received an amount of money and CNA agreed to reconsider Allen's claim to determine his entitlement to future benefits after November 19, 2003, the "any occupation" period.

38.  Prior to the first denial, Allen applied for Social Security Disability ("SSDI").

Administrative Law Judge Warren Albrecht found Allen to be totally disabled.  Judge Albrecht concluded that the opinions of Allen's physicians were consistent with the medical evidence, and showed that he was unable to work full time in even a sedentary occupation:

> The Administrative Law Judge finds that the opinions of the claimant's treating physicians regarding his ability to sustain work are consistent with the medical evidence of record.  He finds the claimant has the ability to perform a limited range of sedentary work, due to his joint and muscle pain.  He finds the claimant's ability to perform sedentary work is limited by the nonexertional impairments as described by Dr. [Patti] States ... .  Furthermore, he finds that considering the claimant's extreme fatigue, combined with the limitations as described above, the claimant is precluded from working at even a sedentary job for a continuous eight-hour day of five days per week.

39. In or around January, 2004, Hartford Life and Accident Insurance Company ("Hartford") acquired CNA.

40.  Hartford assumed the role of claim administrator with the discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the Plan.

41.  Allen's claim was re-opened in or around February, 2005, in accordance with the terms of the settlement.

42.  On March 4, 2005, Hartford conducted a telephone interview with Allen, who reported that his only treating physicians during the preceding three and a half years were Dr. David Carlson, a psychiatrist, and Dr. Dwight Hager, an internist.  Allen, further, reported that he was unable to work because of "chronic fatigue and chronic pain" as a result of "organic problems" from the Interferon medication he took for his Hepatitis C.  Allen, also, reported that he was "housebound;" slept between thirteen to twenty hours a day; could not sit for more than thirty minutes; and could not work because he had "to sleep all the time."

43.  On March 5, 2005, Hartford requested medical records from the healthcare providers Allen identified.  Allen refused to sign an authorization form that would have allowed Hartford to obtain records regarding Allen's mental health and drug/alcohol use because, he claimed, his LTD claim was based solely on his chronic fatigue and pain.

44.  On or about March 15, 2005, Hartford obtained Allen's records from Dr. Hager.  The records indicated that on May 16, 2003, Allen was initially examined by Dr. States.  Drs. States and Hager practiced at the same medical clinic in Billings, Montana.  However, after only four visits with Dr. States, as of October 1, 2003, Allen began seeing Dr. Hager.   Between October 1, 2003 and  October 6, 2005, Allen was examined by Dr. Hager on at least sixteen occasions.

45.  The medical records received on March 15, 2005, again, confirmed that Allen was completely clear of the Hepatitis C virus, and that Allen's pain was stable and controlled.

46.  The medical records received on March 15, 2005, disclosed that Allen was able to travel to Kentucky on his motorcycle in September, 2003, where he sustained a head injury following an accident while riding without his helmet.  Dr. Kevin McCrea examined Allen a few weeks after the accident and reported that he "suffered no brain damage" as a result.

47.  The records obtained on March 15, 2005, also, indicated that on July 31, 2003, Dr. McCrea noted that Allen saw him to get a refill prescription for percodan and that "he [was] not treating our staff very well in order to try and manipulate them into giving him pain medications."  Then, on September 30, 2004, Dr. McCrea noted that Allen sought an early refill of his medications because he was "going out of town."

48.  On March 22, 2005, because of the delay in getting the additional medical information from the physicians to complete the decision on remand within  45 days, Hartford agreed to pay LTD benefits under a reservation of rights while it continued its review of Allen's eligibility to receive further benefits.

49. On or about March 28, 2005, Hartford finally received medical records from Allen's psychiatrist, Dr. Carlson, and the Deaconess Behavioral Health Clinic.  Dr. Carlson concluded that

1    Allen "basically suffers from low energy, low concentration, and low motivation," and diagnosed

2    Allen with either an "Organic Depressive Disorder" or "Depression Secondary to Fatigue."  Dr.

3    Carlson, also, concluded that Allen could not be occupationally employed due to his fatigue.

4        50.  To assess Allen's activity level, Hartford requested a surveillance investigation.  On

5    March 28, 2005, Hartford received the surveillance investigation report which showed that Allen

6    was able to sit, drive, concentrate, and engage in activities that were well in excess of his

7    self-reported limitations.  Allen was observed lifting and carrying groceries, driving for 120 miles,

8    sitting for extended periods of time, spending time in casinos (one time for approximately two

9    hours), and running errands for almost three hours one day.

10       51.  On March 31, 2005, during an interview with a field investigator at his home in

11   Montana, Allen reported the following:  he was not currently involved in any treatment or therapy;

12   he was able to sit for two hours if he changed positions frequently; he was able to concentrate

13   without difficulty; he slept twelve to sixteen hours a night; and that he could return to work on a

14   limited basis – two partial days a week.  Allen maintained that he was prevented from "returning to

15   work because of the extreme fatigue and the extreme pain."  Allen, also, reported that he had flown

16   from Montana to Kentucky a few years ago to visit his father.

17       52.  The investigator, then, inquired about Allen's involvement with his wife's business,

18   ARAJ Enterprises, Inc., which was incorporated on September 16, 2002.  Allen denied any

19   involvement, although information obtained by the investigator identified Allen as the President and

20   his wife, Glenda Allen, as the Secretary and Registered Agent.  ARAJ Enterprises, Inc. is reported

21   to be a web design, hosting, and search engine marketing businesses.  Allen, apparently,  was

22   involved in developing websites for Rock Lock Getaway, Rock Creek Realty, and Immunity Boost.

23   Allen and his wife are, also, listed as distributors for "immunityboost.com."

24       53.  On or about April 8, 2005, Allen's claim file was referred to Behavioral Health Case

25   Manager Diane Baumbach for a preliminary functional assessment.  Ms. Baumbach determined that

26   the medical information in the file substantiates that Allen suffered from functional impairment due

to a mental/nervous condition which precluded him from working.  She noted that Allen had some form of psychiatric treatment, intervention, or assessment regularly since his date of loss, including an overnight stay in a psychiatric hospital after making suicidal threats and a referral for a substance abuse evaluation after he had been drinking and sustained injuries in a physical altercation on November 28, 2001.  She, also, noted that in May, 2002, Dr. Rosen noted that Allen's "biggest impediment towards competitive employment appears to be his poor emotional control and agitation."  However, Ms. Baumbach opined that inconsistencies in Allen's treating physicians' opinions regarding his mental health did not support a continuous functional impairment from a psychiatric condition from his last day of work on May 22, 2001, through January 15, 2003, (the date Allen began seeing his psychiatrist, Dr. Carlson).  Rather, disability based on a mental illness was supported from November 16, 2001, through March 19, 2002, as well as from January 15, 2003, forward.

54.  On April 25, 2005, Medical Case Manager Robert Troxell, R.N., conducted an internal medical case review and concluded that the physical restrictions and limitations claimed by Allen were inconsistent with his observed activities and did not correlate with the medical records.  Mr. Troxell recommended having an independent physician review the records.

55.  Hartford sent Allen's file to Medical Advisory Group LLC to arrange for an independent medical records review.   The Medical Advisory Group retained Dr. Coleman Levin, a board certified internist, to review Allen's medical records and the surveillance video, and then determine whether there should be reasonable restrictions and/or limitations to Allen's physical functioning, if any.

56.   On April 28, 2005, Dr. Levin issued a report in which he concluded that Allen's hypertension and hypothyroidism were well controlled on medication, and that the etiology of Allen's complaints of widespread pain and chronic fatigue were uncertain.

57.  Dr. Levin contacted Dr. Hager to discuss Allen's medical condition prior to completing his report.  The physicians agreed that Allen had the physical capacity to return to a sedentary

occupation on a full-time basis as long as there would be no heavy lifting.  Dr. Levin sent a confirming letter to Dr. Hager memorializing their conversation and asked him to respond if the contents of the letter were inaccurate. Dr. Hager has never refuted the accuracy of Dr. Levin's letter.

58.  Hartford, then, obtained an Assessment of Employability and Labor Market Survey, which found suitable occupations in Montana that Allen could perform based on his experience, education and training, and compatible with the restrictions and limitations provided by Dr. Levin.

59.  On May 24, 2005, Hartford notified Allen that it had concluded that Allen would not be entitled to LTD benefits under the Plan after September 14, 2004.  Hartford determined that Allen was disabled from a mental perspective only.  Allen claimed that the Interferon drug treatment for his Hepatitis C left him with residual side effects of chronic fatigue and depression which precluded him from returning to employment, despite the fact that his Hepatitis C was in remission since January 3, 2002.  However, the maximum twenty-four months of LTD benefits for mental illness ended as of September 14, 2004.  As to any physical limitations, Hartford stated that the medical records and investigation demonstrated a greater level of functionality than Allen reported.  Allen was paid $9,054.53 for additional benefits through September 14, 2004.

60.  On June 8, 2005, Hartford received a medical note from Dr. Hager from a follow-up visit with Allen on June 3, 2005.  Dr. Hager noted that Allen reported "his chronic pain is controlled," although he experiences soreness after heavy lifting.  In addition, Dr. Hager noted that he reviewed the statements he made to Dr. Levin and, while he did not deny reaching the stated conclusion about Allen's capacity to work, after speaking with Allen, he now claimed he realized that he failed to take into account how much Allen's subjective complaint of chronic fatigue was affecting him.

61.  The following day, Hartford received a letter from Allen's counsel advising Hartford of Allen's intent to appeal the denial of his claim.  Allen's counsel requested a copy of the claim file and policy, and that Hartford "not take any action to consider the appeal until such time as we have had an opportunity to both review the administrative record, and to supplement the record ."  The entire claim file was sent to Allen's counsel on July 12, 2005.  Hartford requested all appeal

1    information be provided within 180 days of the denial.  Pursuant to Allen's counsel's request,

2    Hartford later provided an extension until January 9, 2006, for Allen to pursue his appeal.

3         62.  On January 9, 2006, Allen formally appealed Hartford's decision and submitted 158

4    pages of medical records, letters, and comments, most of which were already in the claim file,

5    claiming he was disabled due to the physical limitations from his Hepatitis C treatment.  Included

6    within this documentation was a letter dated December 27, 2005, from Dr. Carlson to Allen's

7    counsel in which Dr. Carlson stated that Allen's "current diagnosis is depression not otherwise

8    specified, 311 in the Diagnostic and Statistics Manual of Psychiatry."  Dr. Carlson, also, stated that

9    he determined that Allen presented with symptoms of fatigue, and had symptoms of chronic pain

10   that were managed by his general medical physician.

11        63.  On appeal, Hartford sent all the medical and surveillance records in the file, including

12   the new documentation submitted by Allen, to Reed Review Services for another independent

13   medical records review, this time by both a psychiatrist and an internist.  Reed Review Services was

14   instructed to carry out a comprehensive case review and provide an evaluation of Allen's work

15   capacity as of September 15, 2004, as well as any significant changes since that date.   Hartford,

16   also, asked for an opinion as to whether Allen's symptoms were due to a physical or psychiatric

17   condition.

18        64.  Dr. Marcus Goldman, a psychiatrist, and Dr. Gary Nudell, an internist, were assigned

19   to conduct his review.  They concluded in their February 28, 2006, report that the evidence did not

20   support total disability.  Dr. Goldman concluded that the information did not support a psychiatric

21   impairment and that Allen's subjective complaints were "not in the least substantiated by objective

22   data."  He, also, stated that despite Dr. Carlson's contention that Allen lacked cognition, there was

23   no evidence to support this assertion.  Dr. Goldman, further, opined that Allen's demeanor with

24   nursing staff indicated a "purposeful manipulative or possibly drug seeking behavior."

25        65. Dr. Nudell found no medical basis that would prevent Allen from performing a full-time

26   sedentary occupation.  He opined that because the Hepatitis C virus was cleared, it was difficult to

1  link Allen's chronic fatigue to a virus that was "no longer detectable."   Dr. Nudell, also, reported

2  that he was not aware of any documented literature which showed a consistent relationship between

3  fatigue and prior treatment with Interferon.  He concluded that "Interferon certainly can cause a host

4  of side effects during treatment, but [there is] no evidence of any long lasting effects."  Therefore,

5  it was more plausible that Allen "had issues with fatigue and depression prior to any treatment" of

6  his Hepatitis C, and "now has subjective progression of these symptoms" after the Hepatitis C had

7  cleared.

8       66. On March 1, 2006, after another review of Allen's appeal and the materials he submitted

9  in support thereof, Hartford a sent a letter to Allen notifying him that Hartford's decision to deny

10  further LTD benefits was being upheld.  Allen, then, filed this action on May 19, 2006, against

11  Continental Casualty Company and the Plan.  On June 27, 2006, CNA was dismissed.

12       67.  Hartford's decision to discontinue benefits was supported by substantial evidence,

13  including but not limited to medical records and information from Allen's treating physicians, three

14  independent medical records reviews, a field investigation, interviews with Allen, internal medical

15  reviews, surveillance video, an Assessment of Employability, a Labor Market Survey, and the terms

16  of the Plan.

17       68.  The administrative record establishes that Hartford reasonably questioned the opinions

18  of Dr. Hager and Dr. Carlson in light of the opinions of three independent reviewing physicians.

19  In view of the totality of the information available to Hartford and its reviewing physicians, they

20  plausibly and reasonably came to different conclusions from that of Allen's treating physicians.

21       69.  Drs. Nudell and Goldman were provided with complete medical records available from

22  the claim file from 2000 through 2006 as evidenced by their report of February 28, 2006.

23       70.  Dr. Levin was provided medical records from May 21, 2001, through March 31, 2005.

24  Dr. Levin's report does not specifically mention records from Dr. Jozwaik, Dr. Zins or Dr. States.

25  However, Dr. Jozwaik  examined Allen on only two occasions, February 22, 2001 and January 9,

26  2002; and Dr. Zins last examined Allen on November 1, 2001, prior to Allen switching physicians

to Dr. Baum because "he could not get along with Dr. Zins."  Dr. States' records were incorporated into Dr. Hager's records as they both practiced at the same clinic. Dr. States's July 25, 2003, letter to the Social Security Administration was not provided to Hartford until January 9, 2006, when Allen submitted additional documentation in support of his appeal.

71.  Hartford reasonably determined Allen was precluded from working due to a mental disorder given Dr. Carlson's diagnosis of "depression not otherwise specified, 311 in the Diagnostic and Statistics Manual of Psychiatry,"  and not based on any physical condition.  This meets the Plan's definition of a "Mental Disorder" in that it is a "disorder found in the current diagnostic standards manual of the American Psychiatric Association."

72.  Allen's claim that he was physically disabled and precluded from working was based on his self-reports of chronic fatigue and pain.  Neither his treating physicians nor the medical record reviewing physicians could provide any medical diagnosis or evidence to explain Allen's continued subjective complaints of pain and fatigue.  Therefore, those would fall within the Plan's "Self-Reported Symptoms" exclusion limiting benefits to twenty-four months.

73.  Because substantial evidence supported Hartford's decision to discontinue LTD benefits after September 14, 2004, it is upheld by this Court.

74.  As the decision to deny benefits is reviewed under an abuse of discretion standard of review, the evidence in the administrative record supports the denial of Allen's LTD claim and his request for LTD benefits beyond the benefits already paid.

75.  Any finding of fact erroneously categorized below as a conclusion of law is hereby incorporated into these Findings of Fact.

## CONCLUSIONS OF LAW

1.  This action is governed by ERISA, 29 U.S.C. §§ 1001-1350.

2.  Insurance policy interpretation is a question of law.  *Carpenters Pension Trust Fund v. Underground Constr. Co.*, 31 F.3d 776, 778 (9th Cir. 1994).

3.  Upon its acquisition of CNA, Hartford became the claim fiduciary with the discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the Plan.  29 U.S.C. § 1002(21)(A)(i).

4.  Where the ERISA plan unambiguously confers discretionary authority on the claim administrator to construe the terms of the plan and determine eligibility for benefits, the abuse of discretion standard of review applies.  *Firestone Tire & Rubber Co. v. Baruch*, 489 U.S. 101, 115, 103 L. Ed. 2d 80, 95, 109 S. Ct. 948, 956-57 (1989).

5.  Both the language of the Policy and the SPD expressly confer discretion initially on CNA and then on Hartford to interpret the terms of the Plan and determine eligibility for benefits and, thus, the abuse of discretion standard of review applies.  *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963-65 (9th Cir. 2006).

6.  Under the abuse of discretion standard of review, the Court will not overrule an administrator's opinion of eligibility unless it was "arbitrary and capricious."  *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 875 (9th Cir. 2004).

7.  California law does not apply because the Policy and Plan documents were issued to Stillwater in Montana, and the Plan was established and administered in Montana, and by its terms provided that Montana law would apply.

8.  It is not improper for Hartford to favor objective evidence of Allen's physical condition and limitations over his subjective complaints of pain and self-reported limitations.  *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 63 F. Supp. 2d 1145, 1156 (C.D. Cal. 1995), *aff'd*, 370 F.3d 869, 877 (9th Cir. 2004).

9.  As long as the record provides a reasonable basis for concluding that the medical condition was not disabling, the Court must defer to the decision of the administrator.  *Jordan*, 370 F.3d at 879.

10.  The administrator is not required to accord special deference to the opinions of treating physicians nor does ERISA impose a heightened burden of explanation on administrators when they

reject a treating physician's opinions. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 831, 155 L. Ed. 2d 1034, 1042, 123 S. Ct. 1965, 1970 (2003).

11.  There is no statutory or other requirement that a plan's medical consultant must examine Allen prior to rendering an opinion. *Abatie*, 458 F.3d at 970.

12.  It is well established that a social security determination is not binding upon an ERISA administrator where, as here, the ERISA plan has a different definition of disability and different evidence was presented in the two proceedings. *Madden v. Long Term Disability Plan for Salaried Employees*, 914 F.2d 1279, 1287 (9th Cir. 1990).

13.  Substantial evidence supports Hartford's decision to discontinue benefits after September 14, 2004.

14.  The denial of Allen's long-term disability claim was not an abuse of discretion, and, thus, the decision is upheld by the Court.

15.  Any conclusion of law erroneously categorized as a finding of fact is hereby incorporated into these Conclusions of Law.

Dated:   July 23, 2008

Terry J. Hatter, Jr.
Senior United States District Judge